LOTTINGER, Judge.
This is a suit wherein the plaintiffs, owners of camp sites on the south bank of the Amite River in the locality known as Magnolia Bluff in the Parish of Livingston, seek an injunction directed at the defendant’s interference with their rights of ingress and egress to their respective camp sites and, particularly, the obstruction by defendant of a roadway, alleged to be public in character. The defendant first filed exceptions of no right and no cause of action and then an answer in which he denied that the road in question was public in nature. The case is now before us on an appeal taken by the defendant from a judgment of the Lower Court which overruled his exceptions and granted to plaintiffs the relief sought.
While the petition sets out various alternative grounds on which the road in question should be declared public, the only question presented by the case, as we ■ see it, is whether the same has been “ * * * kept up, maintained or worked for a period of three years by authority of any parish governing authority * * * ” as provided by LSA-R.S. 48:491.
Various witnesses were called to testify with respect to the road, its location, dimension, and the manner in which it had been kept up, and their testimony is substantially as follows:
Sullivan Mays, one of the plaintiffs, testified that he purchased a lot on Magnolia Bluff and that he had been using the road leading from the Maurepas-Clio Highway to his camp from 1946 to 1952, when he sold his camp to Dr. Brock. He then used the road after he had bought another lot from a Mr. Williams in April of 1956. About the 7th or 8th of April, 1956, the defendant, N. R. Kinchen placed a sign near the road stating, “Notice, Posted. Property of N. R. Kinchen. Private Camp. Trespassers will be Prosecuted.” He stated that he had been going to Magnolia Bluff since 1946 and that to his knowledge, the road had been worked by a public grader, which belonged to the Parish of Livingston and that he had seen it there “frequently.”
On cross examination, this witness testified as follows:
He repeated that he saw the parish grader inside of the cattle gap and estimated the width of the road as between 25 and 30 feet. He described the road as having gravel and shells on the top of it. 'He stated that he had seen the grader in there “numerous times pulled by a tractor.” He stated that he did not know of his own knowledge who had put the shells on the road nor did he know the name of the man who operated the Parish grader on same. He said that the ditches on either side of the road were not over one foot deep as he had driven over them with his automobile. He estimated the length of the roadway from its starting point on the river front to the gap as between 150 and 200 yards.
*499 Mr. Guy Forbes, called on behalf of the plaintiff, testified as follows: He stated that he had been familiar with the Magnolia Landing for about 40 years and that in 194S he was appointed timekeeper to build a road from the Amite River to the Maurepas-Clio Highway. He stated further that he was to secure the rights of way and that they had a 40 foot roadway from the main highway to the river. He stated that the W.P.A. was the agency instrumental in building the road and that it was built “with a shovel and put oyster shells on it from the bluff out. Some bridges were built and the Police Jury hauled stuff in there and labor in and out.” He stated positively that he secured a right of way from the Amite River to the Highway and that the “Government” paid for both labor and the shells that were put on the road. He stated that for the past 40 years there was a public road from the old boat landing on the Magnolia Bluff to’ the Maurepas-Clio Highway and that during that time he had never heard of anybody trying to stop the public from using it. He stated that since its construction, the police jury had maintained the road, furnishing all labor and material to build bridges, etc.
On cross examination, the witness testified as follows:
The road was actually there before the W.P.A. took over and that they just “repaired and rebuilt it.” When questioned about the right of way agreement he repeated that one had been signed but “I wouldn’t know if it was recorded.” He stated that he had seen the road recently as often as five times per week but that he had not seen the Parish grader inside the cattle gap towards the river. He repeated that “I don’t know how far the grader went in, I know how far we built the road which went to the river.” When the road was built, it measured 48 feet from ditchbank to ditchbank. He stated that he had not been inside the cattle gap towards the river within the past six months and that he did not remember the last time he had been on the property.
Mr. Fred Frank, called on behalf of the plaintiff, testified as follows: He stated that he had known of the roadway leading from the main Maurepas-Clio Highway to the Magnolia landing for 34 years during which time it had been used by the public as a public roadway and during which period no one had ever tried to fence it. When asked whether anyone had improved or graded the road, he said that it had been the first time for the state ,and later it was turned over to the Police Jury. Specifically, he stated that back in 1937 the State had allowed their equipment to be used to grade the road because the Parish had no equipment. Later, after the Parish did have equipment, he went in and graded it for the Parish for 4 years. That, he explained, was about 4 years prior to 1946. He repeated that it was a roadway prior to 1937 when he graded it and that he graded it until 1946 with a grader for the State and Parish. Since that time, he stated, he knew it had been graded by a Mr. Watts and then a Mr. Womack.
On cross examination, his testimony was as follows:
He stated that he graded the roadway leading to the Magnolia Bluff “every time I graded the road,” and that, generally speaking, he would average working with the road “as the others in his territory,” on an approximate average of once per month. He stated that Parish gravel or shells were put on the road and that he would spread this material after the truck had dumped it. This, he stated, was in the period 1944, 1945, 1946 and 1947. He gave also the following testimony:
“Q. Do you have any interest in the outcome of this lawsuit? A. No, sir, not a bit in the world.
“Q. How close do you live to Magnolia Bluff? A. About 2 miles.
“Q. How long have you known Dr. L. W. Brock? A. Approximately 37 years.
*500 “Q. Do you know whether or not Dr. L. W. Brock put any shells on that road? A. As far as I know, he has not.
“Q. You are sure that the Parish grader graded the road, you are also sure that the Parish furnished gravel and shells? A. I am positive of it, during the time I was working.”
Mr. J. W. Smith, called by the plaintiff, testified as follows:
That he is 76 years old and has known Magnolia Bluff for over 51 years. He stated that the road has been used for a public road from the boat landing back to the highway. He stated that in the old days the Magnolia Bluff was a boat landing and was used by various small boats and steamers as a regular stop, the roadway in question being the only mode of ingress and egress to the boat landing. He had visited the roadway for the last time approximately 3 to 4 years before the trial at which time he found the road gave some appearances of having been worked by a grader, but not recently, the road appearing to be in a neglected condition. He estimated the roadbed as being “pretty wide, 25 feet or so.” He found shells on the surface of the road and what he thought looked like clay gravel.
Mr. Joseph Picou, called on behalf of the plaintiff, testified as follows:
He is the Police Juror for the Fifth Ward of Livingston Parish (the ward in which the road is situated) and had held that position for a period of two years and 2 months. He was familiar with the roadway leading to Magnolia Bluff and stated that same had been used by the public for over 58 years. He recalled Mr. Frank operating the grader in 1947, during which time he graded the road as a public road. "le stated that during his term of office, he had continually maintained the road.
On cross examination, the witness testified as follows:
He said that the defendant had never objected to having the grader on his property nor to his knowledge had he ever instructed any of the parish employees not to bring the grader on his property. When asked the direct question if, within the past 2i/£ years, the grader had been inside the cattle gap, the witness stated “I don’t know, I don’t follow it up, I reckon they have.”
Mr. Joseph Fortune Fontenot, called on behalf of the plaintiff, when questioned as to whether the road had been graded by public machinery, said that it had and that he remembered when it had been rebuilt by the W.P.A.
On cross examination, he stated that from the cattle gap to the river the road is covered with shells and that since Mr. Kinchen, the defendant, had moved there approximately 2 years and 4 months previous to trial, the graders were not allowed on the property. On re-direct examination, he explained that the cattle gap had been there for only about six months.
On re-cross examination he estimated the road width from ditchbank to ditchbank as being about 40 feet. Several witnesses were asked who had seen the grader on the road inside the cattle gap and answering in the affirmative were Bryant Smith, Mr. and Mrs. Sullivan Mays, Mr. Joe Fontenot and Mr. C. M. White.
Mr. Bryant Smith, called on behalf of the plaintiff, testified that he was at the landing quite a bit when employed by the Wildlife and Fisheries Division of the State of Louisiana and that on one occasion he heard Mr. Strain ask Mr. Watts to grade the road to the river. Fie stated further that the road had been used as a public road ever since 1915, but admitted on cross examination that he had actually seen the grader there on only the one occasion.
Mrs. Sullivan Mays, called on behalf of the plaintiff, stated that to her knowledge, the road had been opened and used by the public since 1946 and that between the years *501 ’47 and ’50, she had seen the grader in there on two occasions, and further, that the road had always been passable, in all kinds of weather.
On cross examination, she stated that she could see the grader on the road between the cattle gap and the river by looking from her bedroom window.
Mr. Clyde M. White, called on behalf of the plaintiff, testified that he had known the road to be a public one for some 13 or 14 years and that during that period he had seen the public grader work the road some 3 or 4 times.
Mr. Joseph J. Farell, called on behalf of the defendant, testified that he lived a mile and a half from Magnolia Bluff and had known the property since about 1930. He stated that he had known Mr. Strain (the defendant’s predecessor in title) and that during the time he owned the property, it had been worked by Parish machinery “But I haven’t seen the machine in there.” He stated that he had worked for Mr. Strain for 2 years and that the machine had not gone on the road while he was there. The roadway leading up to where the cattle gap' is presently situated was worked on the average of once a month, and he estimated the width of the road inside the cattle gap at from 27 to 30 feet and possibly more.
On cross examination, he stated that he had known the road since about 1930 and that it had been a public road since he could remember.
On re-direct examination the witness stated that he had not worked there for two years but only for two summers, and that while he had never seen the Parish grader on the road, he saw where the road had actually been graded.
The defendant, testifying in his own behalf, stated that he had bought approximately 27 acres of land including Magnolia Bluff from a Mr. Strain in the year 1953. When asked whether during the period of time that he had owned the property, had any parish grading machinery been in there, he stated that it had not been. He testified that the road up to his property is well kept up and graded as often as every other week at times. He estimated the width of the road inside the gap as being about 22 feet or not enough for two cars to pass abreast.
In response to a question by the court, the witness stated that the road was there when he bought the place and that he had built the cattle gap.
From the above and foregoing we think the case falls within the holding of the Supreme Court in Porter v. Huckabay, 221 La. 120, 58 So.2d 731, as well as the holdings of this court in Fontenot v. Veillon, La. App., 72 So.2d 587. We believe that the testimony adduced by the plaintiffs’ witnesses shows without a doubt that the road was kept up by the Police Jury for a period in excess of three years and the testimony of the defendant’s witnesses does not controvert this testimony. The fact that the road had not been worked since the defendant acquired the property in 1953 is immaterial.
The defendant relies on the case of Bordelon v. Heard, La.App., 33 So.2d 88, 92. That case is inapposite, however, as is clear from the following language contained in the decision:
“ * * * The most that can be said to have been done on the remainder of the road leading to the rear, was an occasional brushing up which we don’t believe amounted to a keeping-up of the road as required under the statute, and which, moreover, has not been done for so long a time that the road, if it ever could have been said to be public, has been abandoned as such, with the result that the fee title to the roadbed reverted to the owner of the property * * * ”
Counsel for defendant next contends that if the road were at one time public, “in the absence of a dedication making the roadway public, the Parish, by failure to grade and work the road for a period of ten years would result in a clearcut abandonment of *502 same,” citing Goree v. Midstates Oil Corporation, 205 La. 988, 18 So.2d 591. This argument is not sound for the simple reason that the record does not affirmatively show that there was a failure to work and grade the road during a period of ten years.
Finding no manifest error in the judgment appealed from the same is hereby affirmed.
Judgment affirmed.